Filed 6/12/25  P. v. Marsh CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　v.<br><br>JONATHAN SCOTT MARSH,<br><br>　　　Defendant and Appellant. | B334621<br><br>(Los Angeles County<br>Super. Ct. No. KA117372) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Victor D. Martinez, Judge.  Affirmed.

Tracy J. Dressner, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Idan Ivri and Marc A. Kohm, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Defendant Jonathan Scott Marsh appeals from his conviction for first degree murder. Defendant contends the trial court improperly denied him the assistance of an advisory attorney appointed by a prior judge during the pretrial period in which defendant represented himself. He further contends a medical examiner's testimony that relied in part on an autopsy report prepared by a different doctor constituted testimonial hearsay in violation of defendant's constitutional right to confrontation.

We reject these arguments. The trial court's statements and rulings defendant contends denied him access to an advisory attorney concerned his entitlement to a *standby* attorney, that is, an attorney who does not assist a pro per defendant in preparing his or her defense but stands ready to stand in should a self-represented defendant choose to relinquish pro per status. Defendant also fails to show that the trial court's statements and rulings concerning standby counsel had any impact on defendant's preparation for trial or his ultimate decision to accept appointment of counsel.

Much of the medical examiner's testimony was based on photographs and was properly admitted. To the extent arguendo any of the remaining testimony constituted testimonial hearsay, its admission was harmless.

Accordingly, we affirm.

## FACTUAL BACKGROUND

Defendant was accused of stabbing Matthew Musick to death behind a grocery store in Pomona on January 25, 2018.

1. *Prosecution evidence*

The prosecution offered testimony from six eyewitnesses.

W.S., a food company employee who was at the grocery store to stock the shelves, heard someone yell, " 'Stop! Stop' " followed by a second person screaming curse words. W.S. went to see what was happening, and saw a man "getting up and looking down, cursing." She described him to the police as a white man in his 50's. He looked angry. The man grabbed a bicycle and left. W.S. then saw a second man near the dumpster. He had blood covering his face and was trying to get up. W.S. saw several people in scrubs, whom she identified as nurses, run over to help the man on the ground.

V.W. was a grocery store employee. She heard cursing and yelling, then saw a man, whom she identified at trial as defendant, standing over another person who was sitting with his back against the wall. Defendant's fist was balled and he was striking the victim's face, while his other hand held the victim's shirt. The victim was not fighting back—rather, his eyes were "rolling back" and his mouth was open, and his face was covered with blood dripping down to his shirt. Defendant eventually stopped striking the victim but continued cursing at him angrily until defendant got on a bicycle and pedaled away.

L.H. was a nursing student who was on her lunch break with several colleagues in a parking lot separated from the grocery store by a wall. She heard screaming and arguing, and looking over the wall saw a man holding a metal object in a clenched fist raised over his head. She and some colleagues climbed over the wall. The man with the raised fist grabbed a backpack and rode off on a bicycle. L.H. saw a second man lying on the ground bleeding from two puncture wounds on his torso. L.H. and her colleagues attempted to perform CPR on the victim but stopped because "blood was pouring out of the upper wound."

F.R. was another nursing student in the parking lot. He heard someone yell to call the police and that someone was being stabbed. He looked over the wall towards the grocery store and saw three people. He identified one of the people as defendant. Defendant was standing behind another man, holding the man and thrusting his arm into the man's chest. F.R. could see something in defendant's hand but could not identify it. F.R. believed defendant was stabbing the man. The victim fell to the ground, and defendant started rifling through the victim's pockets. F.R. screamed at defendant to stop and jumped over the wall. Defendant got on a bicycle and left. The victim had holes in his shirt and was bleeding from the center of his body. F.R. felt no pulse, so he began performing CPR on the victim. As soon as he started chest compressions, blood started coming out of a wound in the middle of the victim's body.[1]

G.D., another nursing student in the parking lot, heard a commotion and looked over the wall towards the grocery store. He saw two men arguing. One of the men pulled a silver object out of his pocket and stabbed the other two times in the abdomen. The victim fell to the ground, and the attacker stabbed him a third time. G.D. saw blood on the victim's shirt. The attacker left on a bicycle.

I.J. was putting trash in a dumpster in the same parking lot in which the nursing students were located.[2] He heard

---

[1] The witness did not testify further about the third person he saw in addition to defendant and Musick, nor did the prosecution or defense question him about the third person.

[2] The trial court determined I.J. was unavailable for trial, and allowed the jury to view a videotape and transcript of the witness's prior testimony.

4

screaming and saw the nursing students gathered at the wall. He looked over the wall and saw a man leaning over, looking like he was "in agony." Blood was soaking through the man's shirt. The man lay down on the ground. I.J. then saw another man standing near the injured man—that man got on a bicycle and left. I.J. knew the man on the bicycle because both that man and I.J. were homeless and had visited food programs together. I.J. knew him as "John," and identified defendant in a photographic lineup. When testifying, I.J., looking at defendant in the courtroom, said defendant "[l]ooks like John" only "fatter."

A medical examiner testified Musick was stabbed seven times and cut once. His face had bruises consistent with being punched. A toxicology report indicated Musick had three times the legal limit of alcohol for driving, as well as marijuana in his bloodstream.

### 2. *Defendant's police interview*

The jury viewed a video of defendant's police interview. Defendant stated he was homeless and 54 years old. At first he claimed not to be at the grocery store at the time of the stabbing, and that he only heard about the stabbing later.

The police implied they had video footage of the incident. Defendant then changed his story, stating a "fucking nut" came across the parking lot towards him "babbling like crazy." The man went over to defendant's "stuff" and "started looking things over." The man tried to take defendant's backpack, and when defendant moved to stop him, the man "shoved into" defendant. Defendant had a knife in his hand that he used for recycling cardboard, but he denied trying to stab the man with it. The man backed away and "gurgled" but defendant saw nothing on his knife. The man said "something like," " '[T]his is my time.' "

5

Defendant tried to get away on his bicycle but the person grabbed him, causing defendant to drop his knife. The person eventually let go and defendant left.

### 3. *Defendant's testimony*

Defendant testified at trial. He said he went to the dumpsters behind the grocery store to get cardboard to make signs for a yard sale, and had a knife with him for that purpose. A man, whom defendant described as 5' 7" in height, approached him "rambling, babbling on." The man grabbed defendant's backpack, and defendant snatched it back. The man "stomped" on defendant's foot, hurting him. Defendant yelled for help. The man struck defendant in the throat, then "drove himself" into defendant, knocking the wind out of defendant. Defendant was gripping his knife such that only a small portion of the blade extended past his hand. He put one of his fists on the man's chest and the other on his back and pushed him away.

The man at this point became "docile" and leaned against a railing, saying, " 'I guess it's not my bag after all.' " The man "said . . . something about it's my time." He put his hand to his chest and said, " 'I don't know if I'm going to make it.' " Defendant saw no tears to, or blood on the man's clothing, and no blood on his knife, which was still in defendant's hand with only an inch and a half of the blade exposed.

Defendant moved towards his bicycle to leave. The man tackled him from behind. The man gripped defendant's legs and swung at him as defendant struggled to get the man off of him. Defendant saw his knife lying on the ground and grabbed it "to keep [the man] from getting it." Defendant kicked the man, knocking him off balance, and the man fell on top of defendant.

The man bit him several times on the legs. Defendant finally broke free and rode away on his bicycle.

Defendant admitted it was possible he struck Musick with his knife while trying to push him away, but he did not intentionally try to stab him. He denied punching Musick in the face.

Defendant testified he was 6' 2" in height.

## PROCEDURAL HISTORY

A jury convicted defendant of first degree murder and found true the allegation he used a deadly and dangerous weapon. The trial court sentenced him to 26 years to life, imposed fines and fees, and awarded credits. Defendant timely appealed.

## DISCUSSION

### A. The Trial Court Did Not Deny Defendant Access to Advisory Counsel

Defendant argues the trial court, Judge Rubiya Nur presiding, denied him access to advisory counsel assigned by a prior judge to assist defendant during the pretrial period in which defendant represented himself. We reject defendant's characterization of the record, which indicates defendant never raised the issue of advisory counsel with Judge Nur. Rather, he inquired about standby counsel, that is, counsel that does not assist in preparation of the defense but steps in should defendant choose to relinquish pro per status. To the extent defendant argues Judge Nur's responses to his inquiries regarding standby counsel were in error, he fails to show prejudice.

### 1. Relevant law

Criminal defendants have a constitutional right to counsel, but also a constitutional right to represent themselves should they so choose. (*People v. Moore* (2011) 51 Cal.4th 1104, 1119–1120 (*Moore*).) A trial court, at its discretion, may " 'appoint advisory counsel to assist an indigent defendant who elects self-representation. [Citation.]' " (*People v. Morelos* (2022) 13 Cal.5th 722, 738.) Advisory counsel "actively assists the defendant in preparing the defense case by performing tasks and providing advice pursuant to the defendant's requests, but does not participate on behalf of the defense in court proceedings." (*Moore*, at p. 1119, fn. 7.)

As an alternative to, or in addition to advisory counsel, a court may appoint "standby counsel," which "takes no active role in the defense, but attends the proceedings so as to be familiar with the case in the event that the defendant gives up or loses his or her right to self-representation." (*Moore*, *supra*, 51 Cal.4th at p. 1119, fn. 7.) "The roles of advisory counsel and standby counsel are distinct." (*People v. Trujeque* (2015) 61 Cal.4th 227, 261, fn. 9.)

Although a court has the discretion to appoint " 'hybrid representation' " for self-represented defendants, such as advisory or standby counsel, a criminal defendant has no constitutional right to such counsel. (*Moore*, *supra*, 51 Cal.4th at p. 1119.)

### 2. Additional background

We recount in detail the proceedings concerning advisory and standby counsel so the reader may understand defendant's arguments on appeal and why ultimately, defendant's assertion

8

that he was denied access to advisory counsel is unfounded.  The issue is complicated by the absence of transcripts of some relevant proceedings, as well as minute orders that appear to contradict the available reporter's transcripts, as we explain further below.

**a.**  *Trial court appoints advisory counsel*

Between May 13, 2019 and January 5, 2020, defendant filed four motions before two judges under *People v. Marsden* (1970) 2 Cal.3d 118 to replace his appointed counsel.  The trial court denied all four motions.  Immediately following the fourth *Marsden* hearing and denial, defendant's counsel stated defendant wished to proceed with his rights under *Faretta v. California* (1975) 422 U.S. 806 to represent himself.  The trial court, Judge David C. Brougham presiding, stated, "I've given the defendant an opportunity to express his concerns.  And the minute order will reflect that he has not made a request under *Faretta* today.  [¶]  I'm not going to play games.  If he wants to make the motion at the next date, he can."

At the next hearing on January 29, 2020, defendant made a *Faretta* request and Judge Brougham granted it.  Before granting the request, the court advised defendant he did not "have an automatic right to a stand-by attorney, advisory attorney or a co-counsel or some other attorney who will sort of fill in the blanks for you when you need legal advice."

A March 3, 2020 minute order indicates defendant appeared pro per, with no mention of advisory counsel.  There is no reporter's transcript of the March 3 hearing.

On April 22, 2020, defendant filed a request for advisory counsel "to assist the defendant in preparation and presentation of defense case for trial."  (Capitalization omitted.)  At a hearing

9

that same day, Judge Brougham informed defendant, "You do have an advisory counsel and I'll indicate that's Mr. Daugherty, and present throughout the proceedings is Mr. Bestard standing in for him." Defendant said he filed his request for advisory counsel because he did not know he had one. The court said, "So now you know that you have one."

Although the trial court's statements suggest it appointed advisory counsel prior to April 22, 2020, there is nothing in the record on appeal so indicating.

The reporter's transcript for the April 22 hearing, when listing the appearances, states, "Antonio Bestard, standing in for David Daugherty, advisory counsel." The minute order for the hearing, however, does not mention Bestard, and further states, contrary to the reporter's transcript, "Defendant's order granting expert advisory counsel is denied."

The next hearing took place July 21, 2020. The reporter's transcript does not mention an appearance by Daugherty, Bestard, or any other advisory counsel, nor was advisory counsel mentioned or discussed during the hearing. The minute order for that hearing states, "Defendant is advised that he does not have an advisory counsel," although no such advisement appears in the reporter's transcript.

### b. *Defendant inquires about standby counsel*

Between July 21, 2020 and October 6, 2022, defendant appeared pro per at 12 hearings. None of the minute orders or, to the extent they are available, reporter's transcripts for these hearings mentions advisory counsel or any form of hybrid representation.

At a hearing on October 6, 2022, now with Judge Nur presiding, the trial court stated that at defendant's previous

10

appearance, defendant had indicated he understood he had "stand-by counsel" assigned, Daugherty was that counsel, and if defendant's understanding was correct, he intended to relinquish his pro per status and allow Daugherty to represent him. There is no reporter's transcript of the hearing immediately preceding the October 6, 2022 hearing at which defendant apparently first asked Judge Nur about standby counsel and Daugherty.

The trial court further stated that when, at the previous hearing, defendant had raised the issue of standby counsel, the court "told [defendant] that I will look into it because my policy is always, there's no stand-by counsel." If a self-represented defendant asks for help, "they don't get somebody to consult with." The court stated, however, that if a self-represented defendant "unequivocally" indicates the defendant wishes to relinquish pro per status, the court would appoint representation at that point.

The court then asked defendant whether he wished to relinquish his pro per status and have the court appoint counsel. Defendant said he was not ready to have counsel appointed, but simply wanted to know if Daugherty was "still my stand-by."

The court responded, "[Y]ou want to know, specifically, if Mr. Daugherty was your stand-by counsel. But for me to answer that question now is moot because you are not wanting to relinquish your pro per status anyway because you want to represent yourself and carry on working on some stuff. [¶] What does it matter whether there is stand-by counsel or not? And if Mr. Daugherty is stand-by counsel or not, that issue is moot. You're not saying: Judge, did you investigate—did you find out if I have a stand-by counsel or not? . . . [A]nd if [I] do have a stand-by counsel, is that Mr. Daugherty? You're not asking that.

11

You're telling me that you wish to . . . continue to represent yourself because you have some things that you need to work on. So that question [about stand-by counsel] is no longer in effect, right, if you understand what I'm saying?"

The court continued, "I mean, if you were saying: Judge, . . . because you did tell me, Judge, that you will review the file, did you find out if I have a standby counsel, Judge, and is that Mr. Daugherty, because, Judge, if your answer is yes to both questions, I am giving up my pro per status today. Judge, please invite Mr. Daugherty and I want to sit down and talk to him. I am already in court and Mr. Daugherty can discuss things with me. You're not saying that. [¶] So you need to be more clear. Are you telling me that you are asking me if you have a standby counsel? [¶] And, number two, are you asking if that's Mr. Daugherty? And are you telling me: Judge, if your answer to both is yes, then I am going to relinquish my pro per status today and I wish that attorney to be appointed? Are you telling me that? What are you telling me or asking me?"

Defendant began, "Judge Brougham—" and the court interrupted: "No. No. No. Let's not go back to Judge Brougham. Listen to my question because this is—" Defendant then interrupted, "I'm trying to answer—" and the court said, "Mr. Marsh, don't talk over me. Listen to my question. You brought this issue up [with] the last court. I clarified it. I reviewed the file. [¶] So I am asking you, sir, is your question today: Do I have a standby counsel, Judge, and is my counsel Mr. Daugherty? Because if you say[ ] yes, Judge, then I am going to relinquish my pro per status and I want Mr. Daugherty to come and talk to me; are you saying that to me? Or are you saying: Judge, it doesn't matter because I need time because I—

12

like you advised me, I'm working on some things and I wish to do some work on my case?  What are you asking?  Let's talk about that.  Don't talk to me about Judge Brougham or any other judge in the past."

The court repeated its question: "[A]re you asking me: Judge, do I have a standby counsel who is Mr. Daugherty because if it is so, Judge, I want to relinquish my pro per status and have Mr. Daugherty appointed; are you telling me that?"

Defendant responded, "No.  I am not telling you that." Defendant stated, "I want to know if [Daugherty] was still the person in line.  And there's some things that I need to address before I am ready and willing to go that route" and relinquish pro per status.  The court stated, "We don't play those kind of games," and reiterated whether defendant had standby counsel and who that counsel was mattered only if defendant wished to have counsel appointed.  The court stated defendant was not entitled to information about standby counsel "just" because he "want[s] to know the information for [his] personal whatever."

The court went on to address other matters, including defendant's request that his experts each be paid for 10 hours to consult with him in advance of trial.  The prosecutor asked the court to set a trial date, because by the time that date arrived, defendant would have time to finish preparation with his experts.

The court stated it would set a trial date, and the "date will be cemented."  The court warned defendant about coming back on that date and asking for counsel to be appointed at that time: "We don't play those kind of games in my courtroom."  Defendant stated, "I'm not playing games."

The court stated, "I'm very clear with you today. . . .  You told me your understanding was that the previous judge told you

that they have a standby counsel, and that it was Mr. Daugherty. And I told you, I have no idea. I will have to look into it. I cannot say yes or no. I have looked into it. And so I asked you, and I am, again, asking you—discussing it for the hundredth time today on the record. I have looked into it and my question to you is if I tell you today, yes, you have a standby counsel and, yes, you have Mr. Daugherty as the standby counsel, is your answer going to be: Okay, Judge. I am giving up my pro per status and I want that attorney appointed? You have told me, 'No.' I am not prepared to do it today."

The court told defendant to "[t]hink about it and let me know again because, once I set that date, come rain, come shine, that trial will go on that date, whether you are prepared or not or whether you tell me 'I need an attorney now because I can't swim any longer.' [¶] So think about it. I'm going to give you a couple of minutes. If your understanding is Mr. Daugherty is your standby counsel, that may just happen today. But if you're not interested, then we are not going to discuss that. I am going to set trial dates."

Defendant began to speak about his expert reports, and the court stated it was not interested in discussing expert reports, but wanted to know if defendant wished to move forward pro per, or "to make a different decision." Defendant answered, "I am not ready to give up my [pro per] status."

The court set February 6, 2023 as the trial date, with a readiness conference set for February 2.

Defendant asked if it would be possible for him to relinquish his pro per status before the trial date. The court said, "[Y]ou can always do whatever you want, give up your pro per status. But, at that time, this case will move forward and you

14

will have an attorney who will be told:  Hello, counsel.  Good morning.  Pick a jury because Judge Nur has 12 in the box.  If you want to put yourself in that position, that's your life; it's not my life."  Defendant stated, "So I'm taking it Mr. Daugherty is no longer my standby."  The court responded, "We are not talking about Mr. Daugherty because you are not wanting Mr. Daugherty."  Defendant agreed he did not want Daugherty appointed "at this moment.  I haven't done all of my paperwork yet."

The court stated, "We're not going to do these games."  The court and defendant then engaged in another back and forth in which the court reiterated its view that the issue of standby counsel did not matter unless defendant was going to relinquish pro per status, and defendant repeated he was not ready to relinquish that status.

Defendant again asked if the court was saying he could not relinquish pro per status after that point.  The court said defendant could relinquish his status even after a jury was picked, "but you need to understand that, at that time, your counsel is going to come in without having prepared this case because counsel will be coming in running."  Defendant stated he did not "understand why [the court was] dodging the question" whether "Mr. Daugherty is my stand-by.  He's supposed to be up to speed and ready to go when I give up my status."  The court responded, "I see.  I see.  So your standby counsel is going to work on your timeline?"  The court said, "There is no such thing as your standby counsel needs to be up and ready to go as soon as you give up your pro per status."

The court continued, "So I am telling you right now that you do not have the right to ask me:  Isn't my standby counsel

supposed to be all ready and ready to proceed as soon as I give up my pro per status?" The court repeated, however, that defendant could relinquish pro per status whenever he wished.

### c. *Court warns defendant it will grant no further continuances to the extent he is unprepared to represent himself at trial*

Defendant did not appear at the readiness conference on February 2, 2023 for excusable reasons.

On February 6, 2023, defendant filed a written request for a continuance, contending the telephone lines in the jail had been down so he had not been able to communicate with his investigator or experts.

At a hearing that same day, at which defendant appeared, the trial court began by summarizing the discussion of standby counsel at the previous hearing. The court stated defendant "has advised this court numerous times that he will not be going to trial representing himself. He will be asking for counsel to represent him at the trial stage. [¶] However, he also advised the court that he is not going to give up his pro per status until he feels the case is ready, and then he will ask for a court-appointed attorney." The court asked whether defendant still wished to proceed pro per, and advised him that if he wished counsel appointed, counsel would not be ready to proceed when trial commenced in two days, the new date set for trial.

Defendant stated, as he had in his continuance motion, that he had not been able to communicate with his experts or his investigator for two months because of telephone problems at the jail. The court asked if defendant had tried writing to his investigator, and he said he had not. The court said it would proceed to trial and would not give defendant more time. The

16

court stated, however, that if defendant relinquished pro per status, the court would appoint counsel and grant a continuance so counsel would have time to prepare.

Defendant stated he would not be ready for trial without first consulting his experts. The court reiterated it was denying a continuance based on defendant's inability to consult his experts.

The prosecutor noted that defendant had five months since the court set the trial date at the October 2022 hearing, and the prosecutor spoke with defendant's investigator, who said he had not heard from defendant since October 2022. The prosecutor further noted even if the jail phones had been down for two months in December and January, that would not explain why defendant had not contacted his investigator or experts in October and November.

The court stated the investigator similarly had advised the court's judicial assistant he had not heard from defendant since October.

Defendant argued that, besides the phone issues, he had been unable to consult with his experts because the trial court never signed orders for pretrial consultation, which defendant had failed to present at the October 2022 hearing but now had for the court to sign. The prosecutor noted defendant's investigator could have obtained the court's signatures on the orders earlier, yet defendant had not provided the orders to the investigator.

The court set a pretrial conference for February 9, 2023, and stated it would sign the pretrial consultation orders. The court also stated that if defendant were able to consult with his experts by February 9 and be prepared to proceed to trial at that time, he could continue pro per. If he was not ready, the court would not grant any continuances if defendant wished to remain

pro per.  The court would, however, appoint counsel if defendant wished.

### d.  *Defendant relinquishes pro per status*

At the February 9, 2023 hearing, the trial court asked if defendant was ready for trial.  Defendant said no, the three days the court gave him were insufficient to meet with his experts, and the court was "pushing me into trial."  The defendant then made an oral peremptory challenge to Judge Nur on this basis.

The trial court summarized the earlier discussions of standby counsel, and noted again that defendant "not once, but repeatedly, advised this court that he had no intention of going to trial by himself, as in representing himself.  He will be asking for counsel."  The court stated, "[Defendant] then proceeded to advise the court he had information that there is a counsel by the name of . . . Dave Daugherty, who has been appointed as standby counsel.  [Defendant] has Googled, searched [for] the attorney, and he has found out that he is a good attorney.  The court did get an impression at that time that [defendant] was trying to delay the process."

The court then summarized at length the proceedings stemming back to defendant's request to represent himself.  This included the minute orders from April and July 2020 erroneously stating Judge Brougham had not appointed advisory counsel, although Judge Nur did not note the error nor did defendant raise it.

The court recounted the numerous experts requested by defendant and approved by Judge Nur and prior judges, as well as the many times the court had granted defendant pro per funds.  The court noted it had granted defendant a trial continuance over the prosecutor's objection in June 2021.  The

18

court further noted it had granted defendant's medical request for a private shower in jail.

The court reiterated defendant's investigator had told the court defendant had not contacted him since October. The prosecutor said the investigator had said the same to her, but also had confirmed the jail was having trouble with its telephones in December and January, as defendant claimed. The prosecutor noted this did not explain the lack of communication in October and November.

The court stated its judicial assistant had contacted the investigator the day before the February 9 hearing, and the investigator said defendant had told him in October he was ready and did not need the investigator to do anything further. When the investigator heard from defendant more recently, defendant told him he had been unable to contact him because he had run out of money. The court noted this was not true because the court had allotted pro per funds to defendant. Also, the investigator told the court that his clients frequently called him collect.

The court concluded defendant had made no effort between October and February to prepare for trial, and was delaying the process by requesting experts but "not coming to any sort of result or ending the situation."

The court asked if defendant wished appointment of counsel. Defendant asked if the court was ignoring his peremptory challenge. The court stated it would not be presiding over the trial in any event. The prosecutor added that defendant's peremptory challenge was untimely. Defendant said he did not understand why he could not bring his peremptory challenge, "but if I'm going to be backed in this corner, then I

19

want counsel." The court immediately appointed the bar panel attorney on duty that day, and granted a trial continuance so the attorney could prepare.

After the noon break, the bar panel attorney informed the court he had contacted Daugherty and would pick up discovery from him. The court made a record that when defendant first raised the issue of standby counsel, the court reviewed the case file and informed Daugherty he would be counsel if needed. Daugherty, however, "called the court early on and advised the court that he was having some medical issues and would not be able to represent the defendant if he was appointed any time soon." The court had told Daugherty, "[T]hat's fine."

The bar panel attorney represented defendant throughout the trial.

### 3.    Analysis

Defendant argues that Judge Brougham appointed Daugherty as his advisory counsel, but Judge Nur, in refusing to answer defendant's inquiries about Daugherty, denied defendant the assistance of that advisory counsel. Defendant contends this effectively nullified Judge Brougham's order and prejudiced defendant because he did not have Daugherty's assistance in preparing for trial, including readying defendant's experts.

Defendant further argues Judge Nur's refusal to answer his questions about Daugherty, as well as what defendant characterizes as Judge Nur's misstatements about defendant's entitlement to advisory or standby counsel, "wore [defendant] down to the point where [defendant] had no choice but to abandon his self-representation." Defendant contends this violated his constitutional right to represent himself.

20

We disagree with defendant's reading of the record, which does not support either his contention that Judge Nur denied him the assistance of advisory counsel or that defendant was forced to relinquish his pro per status because of Judge Nur's statements about hybrid counsel. As we explain, defendant's arguments concerning advisory counsel are a red herring, because he never raised the issue of advisory counsel with Judge Nur—rather, he raised the issue of standby counsel, an entirely different concept. Assuming arguendo Judge Nur's responses to defendant's inquiries about standby counsel were in error, defendant fails to show those errors caused him to relinquish pro per status.

It appears that as of the April 22, 2020 hearing, Judge Brougham had appointed Daugherty as advisory counsel. To recap, advisory counsel is intended to "actively assist[ ] the defendant in preparing the defense case by performing tasks and providing advice pursuant to the defendant's requests." (*Moore*, *supra*, 51 Cal.4th at p. 1119, fn. 7.) At no point after Judge Nur took over the case, however, does the record indicate defendant ever asked whether Daugherty was his advisory counsel, that is, whether Daugherty was available to perform pretrial tasks or provide advice. Nor did defendant ask Judge Nur to allow him to consult with Daugherty.

Rather, defendant inquired about Daugherty only to determine if Daugherty would step in and represent him should defendant relinquish his pro per status. In so inquiring, defendant was asking about Daugherty not as *advisory* counsel but as *standby* counsel, that is, counsel who "takes no active role in the defense, but attends the proceedings so as to be familiar with the case in the event that the defendant gives up or loses his or her right to self-representation." (*Moore*, *supra*, 51 Cal.4th at

21

p. 1119, fn. 7.) Indeed, defendant expressly asked whether Daugherty was "still [his] stand-by," with no reference to advisory counsel.

Defendant's contention that Judge Nur denied him Daugherty's assistance or advice in preparing for trial therefore is ill-founded, when the record does not indicate defendant ever asked Judge Nur about Daugherty in this capacity or requested Daugherty's assistance or advice. Judge Nur did not contradict or nullify Judge Brougham's earlier order appointing advisory counsel—Judge Brougham's grant of advisory counsel simply never came up.

Defendant argues that when he asked Judge Nur about Daugherty as "standby" counsel, he in fact meant "advisory" counsel, the only capacity in which the record reflects Judge Brougham appointed Daugherty. Defendant states, "The record does not show why Judge Nur repeatedly used the term standby counsel instead of advisory counsel," and had Judge Nur examined the case file, she would have realized her mistake.

The record in fact makes entirely clear why Judge Nur used the term "standby" rather than "advisory." First, that was the term defendant himself used. Second, defendant used that term correctly, asking not whether Daugherty was available for consultation and assistance, but instead, whether Daugherty was ready to step in and represent him, which is the very definition of standby counsel. As previously explained, advisory counsel assists a defendant in preparing to represent him- or herself; advisory counsel is not appointed to step in for the defendant at trial.

We also reject defendant's suggestion that Judge Nur did not review the case file, and had she done so, she would have

22

realized Judge Brougham had appointed Daugherty as advisory counsel. As noted in the additional background provided in our Discussion, part A.2, *ante*, the minute orders in this case erroneously stated Judge Brougham had *denied* the request for advisory counsel. Judge Nur was aware of those minute orders, because she summarized them when recounting the proceedings in the case at the February 9, 2023 hearing. Although defendant argues the reporter's transcript prevails over the minute orders, Judge Nur had no reason to doubt the minute orders, when defendant never raised the issue of advisory counsel with her or called her attention to the errors in the minute orders. Judge Nur therefore had no reason, based either on the case file or defendant's questions, to think defendant was inquiring about Daugherty as advisory, as opposed to standby, counsel.

The record further reflects that defendant relinquished pro per status not over any confusion regarding advisory or standby counsel, but because he was unprepared for trial and Judge Nur denied further continuances. At the February 9, 2023 hearing, defendant stated he was not ready for trial because he had not had time to consult with his experts, and if Judge Nur insisted on moving forward with trial he would seek to remove her through a peremptory challenge. Judge Nur made clear she would not consider the peremptory challenge, nor would she grant further continuances. Defendant then said, "[I]f I'm going to be backed in this corner, then I want counsel." In the context of the hearing, the "corner" to which defendant was referring was the impending trial date for which he claimed he was unprepared. Defendant's unpreparedness had nothing to do with whether he had standby counsel or who that counsel was, because, again, standby counsel does not assist a pro per

defendant in preparing for trial. Nor can defendant claim he was unprepared because Judge Nur denied him access to *advisory* counsel when, as we have explained, he never raised that issue with Judge Nur.

Defendant argues Judge Nur misrepresented the law when explaining defendant's entitlement to hybrid representation. Judge Nur indicated her policy was not to appoint standby counsel, which defendant contends "is impermissible because the appointment of hybrid counsel is a discretionary act" not subject to a "blanket policy" of denial. Judge Nur also said there was "no such thing as your standby counsel need[ing] to be ready to go as soon as you give up your pro per status," but defendant argues, "[T]hat is exactly the purpose of having standby counsel."

Assuming arguendo either of these statements were erroneous, defendant fails to demonstrate they had any impact on defendant's decision whether or not to proceed pro per.[3] Defendant does not explain on appeal how he would have proceeded differently had Judge Nur assured him he was entitled to standby counsel and Daugherty was that counsel. The record in fact suggests defendant would not have done anything differently at all: Judge Nur repeatedly asked defendant whether, if she told him Daugherty was his standby counsel ready to step in, defendant would then request Daugherty's appointment, and defendant repeatedly said no.

For the same reason, defendant has not shown prejudice from Judge Nur's decision not to inform defendant until after

_____

[3] Although we conclude Judge Nur's statements were not prejudicial, we caution that a trial court should avoid declaring blanket policies that may suggest the court misunderstands its authority to exercise its discretion on a case-by-case basis.

24

defendant had relinquished pro per status that Daugherty had, in fact, been appointed his standby counsel, but later withdrew from the assignment because of medical reasons. By defendant's own admission, he intended to remain pro per as long as possible regardless of whether Daugherty was his standby counsel, so the court's reticence was irrelevant to that decision. Defendant also was not prejudiced by Daugherty's unavailability to step in immediately as standby counsel, because the court granted the bar attorney appointed as Daugherty's replacement a continuance to prepare for trial. Defendant does not argue otherwise on appeal.

Defendant contends he cannot be faulted for not asking to consult with an advisory attorney when Judge Nur repeatedly refused to answer his questions about Daugherty. As discussed, at no point did defendant indicate to Judge Nur he was asking about Daugherty because he wished to consult with Daugherty as his advisory attorney. Again, defendant asked only if Daugherty was "still my stand-by" and ready to step in when and if defendant chose to relinquish pro per status. To the extent Judge Nur declined to answer questions about Daugherty as *standby* attorney, this did not constitute a denial of access to an *advisory* attorney, something defendant never requested from Judge Nur. Further, as set forth above, the lack of information regarding standby counsel had no impact on defendant's decisionmaking, when defendant himself stated he was not ready to relinquish pro per status even if the trial court confirmed Daugherty was his standby counsel.

We acknowledge Judge Nur stated at the October 6, 2022 hearing that her policy was to deny self-represented defendants "somebody to consult with," although they could request

appointment of counsel at any time. We do not interpret Judge Nur's articulation of her own general policy as a rejection of Judge Brougham's appointment of advisory counsel for defendant, an appointment of which Judge Nur was unaware because defendant never raised the issue of the appointment with her, and the record erroneously indicated Judge Brougham never appointed advisory counsel. Nor does defendant argue he would have requested access to advisory counsel had Judge Nur not made this statement.

Defendant does not contend the trial court erred in denying him a trial continuance or declining to rule on his peremptory challenge. His only argument concerning pretrial matters is the court interfered with access to his advisory attorney and his constitutional right to self-representation. As set forth above, that argument is a smokescreen for the true reason defendant relinquished pro per status, namely his self-inflicted failure to prepare for trial.

## B. Any Admission of Testimonial Hearsay Was Harmless

Defendant contends the medical examiner's testimony, which relied on an autopsy report prepared by a different doctor, constituted testimonial hearsay in violation of defendant's constitutional right to confront witnesses against him, as well as inadmissible hearsay under the Evidence Code. Defendant concedes his trial counsel did not object to the testimony, but claims this demonstrates counsel was constitutionally ineffective. We conclude the most important aspects of the medical examiner's testimony were based on photographs and therefore properly admitted. Assuming arguendo the remainder of the testimony was hearsay, testimonial or otherwise, its admission was harmless.

26

### 1.   Additional background

Dr. Timothy Dutra conducted Musick's autopsy and prepared a report.  Dutra did not testify at trial.  Instead, Dr. Kevin Young, a deputy medical examiner, testified.  Young was not present for the autopsy.  Young testified he reviewed Dutra's report, diagrams, and photographs from the autopsy.  Asked if he was able to review these materials "to make [his] own conclusions," Young said yes.

Young stated that Dutra's report indicated Musick's height and weight, and Young provided those numbers to the jury.  He testified to the results of a toxicology report indicating Musick had a significant amount of alcohol in his bloodstream—three times the legal limit for driving—as well as some marijuana.

Young stated Dutra's report noted eight injuries inflicted by something sharp, specifically seven stab wounds and one cut.  The prosecutor then presented autopsy photographs of the injuries to the jury, and Young explained what the photos showed and how they corresponded to the autopsy diagrams.  For each wound, Young identified the location, the length and depth, whether the wound was a stab or a cut, and the direction of the wound, such as "backwards and down."  The wounds were on Musick's face, chest, underarm area, and back.  Young identified the fourth wound as the fatal injury, noting its depth and direction and that it struck the pulmonary artery, which would have killed the victim within minutes.  Young identified two other wounds as potentially fatal, and another wound that fractured Musick's rib.

Young testified other photographs showed abrasions on Musick's face and body.  Young said the facial abrasions were consistent with Musick having been punched.

27

Young explained one cannot determine from the direction of the wound how the victim or attacker were positioned. The direction of a wound is determined by sight and feel, including by putting a finger into the wound. Young acknowledged he could not determine whether Musick suffered the abrasions during the attack as opposed to some earlier time.

In closing argument, the prosecutor reiterated Young's testimony that Musick had been stabbed eight times, and had suffered abrasions consistent with being punched. The prosecutor also reiterated Young's testimony regarding the size and direction of the eight wounds, noting, inter alia, that one of the stabbing wounds was fatal and another fractured a rib.

The defense in closing argued Marsh had acted in self-defense. The defense noted the autopsy report described Musick as muscular and well-nourished, as well as intoxicated.

In rebuttal, the prosecution showed the photos again and referenced Musick's height and weight, arguing he was not muscular. The prosecution argued the evidence of eight stab wounds was not consistent with defendant's testimony suggesting the stabbing was accidental. The prosecution further argued the depth and direction of the wounds was inconsistent with defendant's testimony that he was gripping the knife such that only a small portion of the blade extended past his hand.

### 2.    Relevant law

The Sixth Amendment of the federal Constitution "guarantees criminal defendants the right to confront adverse witnesses." (*People v. Nadey* (2024) 16 Cal.5th 102, 162 (*Nadey*).) The United States Supreme Court has held "that the admission of 'testimonial' hearsay against a criminal defendant violates the Sixth Amendment right to confrontation unless the declarant is

28

unavailable *and* the defendant had a prior opportunity for cross-examination." (*Id.*, citing *Crawford v. Washington* (2004) 541 U.S. 36, 53–54.)

The United States Supreme Court has not provided "a comprehensive definition of 'testimonial' [citation]," but "[g]enerally speaking, a declarant's hearsay statement is testimonial if made 'with a primary purpose of creating an out-of-court substitute for trial testimony.' [Citation.]" (*People v. Fayed* (2020) 9 Cal.5th 147, 168.) Erroneous admission of testimonial hearsay requires reversal unless the error "would have been harmless beyond a reasonable doubt." (*People v. Garton* (2018) 4 Cal.5th 485, 507, citing *Chapman v. California* (1967) 386 U.S. 18, 24.)

Our Supreme Court has further held that, "regardless of any testimonial character," "out-of-court statements offered to prove case-specific facts are hearsay" (*People v. Valencia* (2021) 11 Cal.5th 818, 833, fn. 14), and therefore cannot be admitted without an applicable hearsay exception under the Evidence Code (*People v. Sanchez* (2016) 63 Cal.4th 665, 684–685). Erroneous admission of hearsay that is *not* testimonial is reviewed for harmless error under the test set forth in *People v. Watson* (1956) 46 Cal.2d 818, which "inquires whether 'it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' [Citation]." (*Valencia*, at p. 840.)

In the specific context of medical examiner testimony based on an autopsy performed by someone else, our Supreme Court has defined particular categories of evidence, some of which present hearsay problems and some of which do not. An expert

may testify based on autopsy *photographs* because photographs are not hearsay. (*Nadey*, *supra*, 16 Cal.5th at pp. 162–163.)

It is also permissible for an expert "to testify about his own independently conceived opinions, even if those opinions were based on inadmissible hearsay." (*Nadey*, *supra*, 16 Cal.5th at p. 163.) " 'Any expert may still *rely* on hearsay in forming an opinion, and may tell the jury *in general terms* that he did so. Because the jury must independently evaluate the probative value of an expert's testimony, Evidence Code section 802 properly allows an expert to relate generally the kind and source of the "matter" upon which his opinion rests.' [Citations.]" (*Nadey*, at p. 163.)

"A 'hearsay problem arises,' " however, " 'when an expert simply recites portions of a report prepared by someone else, or when such a report is itself admitted into evidence. In that case, out-of-court statements in the report are being offered for their truth.' [Citation.]" (*Nadey*, *supra*, 16 Cal.5th at p. 163.)

Although recitation of a report prepared by someone else is hearsay, it is not always *testimonial* hearsay in violation of the Sixth Amendment. Our high court has held that a pathologist's "anatomical and physiological observations about the condition of the body" are "objective facts" that are not "so formal and solemn as to be considered testimonial for purposes of the Sixth Amendment's confrontation right." (*People v. Dungo* (2012) 55 Cal.4th 608, 619, 621.)

As defendant notes, in subsequent cases our Supreme Court has declined to rely on *Dungo*, instead deciding the question on harmless error grounds. (See *People v. Perez* (2018) 4 Cal.5th 421, 454, 456 ["We need not address *Dungo*'s continued viability here because any federal constitutional error arising

30

from the admission of [a pathologist's statements derived from another pathologist's autopsy report] was harmless beyond a reasonable doubt.") Out of an abundance of caution, we follow the same course here, and assume arguendo that any hearsay was testimonial and therefore subject to the stricter constitutional standard for harmless error.

A defendant forfeits an appellate challenge based on confrontation principles or statutory hearsay prohibitions absent objection below. (*People v. Redd* (2010) 48 Cal.4th 691, 730; *People v. Perez* (2020) 9 Cal.5th 1, 7.) Acknowledging this, defendant argues his trial counsel was ineffective for not objecting to Young's testimony. To establish ineffective assistance of counsel, "a defendant must show that their counsel's performance was deficient, *and* that this deficient performance prejudiced the defense." (*In re Tellez* (2024) 17 Cal.5th 77, 88.) "A reviewing court can begin an ineffective assistance of counsel inquiry with either element and need not address both elements if one is not satisfied." (*Ibid.*) "Indeed, it is often preferable for a court to dismiss an ineffective assistance of counsel claim solely for lack of prejudice." (*Ibid.*)

### 3.    Analysis

Defendant concedes he is not challenging Young's testimony to the extent it was based on autopsy photographs or Young's independent opinions not based on specific facts in the autopsy report. Defendant contends some of Young's testimony, however, "simply repeated information that Dutra reported and for which Young had no independent knowledge." Defendant identifies the following evidence as impermissible hearsay: Musick's height and weight, Dutra's observation of seven stab wounds and one cut, the descriptions of the length and depth of

31

the wounds, whether the wounds were stab wound or incised wounds, the direction and orientation of the wounds, and the internal damage caused by the wounds.

Young could and did rely on the autopsy photographs when he testified regarding the number of wounds and their location, and we therefore disagree that testimony conveyed hearsay evidence.

It appears from the record Young relied entirely on the autopsy report when testifying to Musick's height and weight. It is not clear from the record whether he relied on the photographs, as opposed to the autopsy report and diagrams, when testifying as to the length, depth, direction, and internal damage caused by the wounds, and whether they were from stabbing or cutting—the photographs are not in the record before us, and neither the prosecutor nor the defense sought clarification on the specific source of each item of information relayed by Young.

We need not determine whether Young relied on hearsay when testifying about the dimensions, direction, and damage caused by each wound, and whether they were stabs or cuts. Assuming arguendo he did, and further assuming arguendo the hearsay was testimonial, the admission of his testimony was harmless, even under the constitutional "reasonable doubt" standard for harmless error.

The jury heard evidence from six eyewitnesses who, despite some differences in their recounting, all testified to an altercation between defendant and Musick that left Musick lying on the ground covered in blood. Several of the witnesses observed defendant strike Musick with a knife or silver object. The nursing students, who tried to help Musick, testified that he was unresponsive and had blood pouring from his wounds. Young,

32

relying on autopsy photographs, offered admissible testimony that Musick had suffered eight injuries consistent with a knife on his face, chest, side, and back.

The combination of eyewitness testimony and Young's admissible testimony regarding the number and location of the wounds contradicted defendant's testimony that, to the extent he stabbed Musick, it was unintentional. Beyond a reasonable doubt, the jury would have convicted defendant on this evidence alone.

To the extent Young's other testimony relied on hearsay, it was duplicative or of marginal importance given the properly admitted evidence. The testimony regarding the size of the wounds and the damage they caused spoke to the severity of the injuries, but given the testimony of multiple eyewitnesses that Musick was unresponsive with blood pouring out of him, the severity of the wounds was not reasonably in question. Young himself testified the direction of the wounds indicated nothing as far as the position of the attacker or victim, so there were no conclusions the jury could draw from that information. We see no relevance to whether the injuries were caused by stabbing or cutting. However Musick was injured admissible evidence indicated the injuries were multiple and severe. Defendant does not argue on appeal that admission of Musick's height and weight was prejudicial, nor can we discern how it would have been prejudicial given inter alia defendant's own trial testimony indicating he was significantly taller than Musick.

Defendant argues the prosecutor in closing relied on Young's testimony regarding the depth and direction of the wounds to dispute defendant's testimony as to how he was gripping the knife and how he was positioned when he

accidentally stabbed Musick.  We conclude the prosecutor's reliance on this evidence during closing could not have affected the verdict.  The argument was a small portion of the prosecutor's closing, and defendant's version of events was dramatically undermined by the eyewitness testimony and photographic evidence indicating defendant stabbed or cut Musick multiple times all over his body.

Defendant argues Young's testimony "was especially important because the witnesses who saw parts of what took place between [defendant] and Musick provided inconsistent testimony about who did what."  We agree Young's *admissible* testimony regarding the number and location of the knife wounds was helpful to the prosecution given the witnesses' varying accounts of whether and how defendant struck Musick and whether he used a knife.  As discussed, however, the arguably inadmissible testimony regarding the depth and lethality of the wounds was far less important, when all witnesses consistently testified that after the attack Musick was lying on the ground covered with blood.

Defendant notes that in addition to Young's testimony, the prosecutor introduced three pages of autopsy diagrams into evidence.  These diagrams are not in the record before us, and defendant does not argue they provided information beyond that to which Young testified—rather, he argues the diagrams "bolstered" Young's "detailed testimonial hearsay about the nature of Musick's wounds."  Admission of the diagrams therefore was harmless for the same reasons Young's testimony based on those diagrams was harmless.

Because any admission of hearsay was harmless, defendant has failed to demonstrate prejudice as required for an ineffective assistance of counsel claim.

## DISPOSITION

The judgment is affirmed.
<u>NOT TO BE PUBLISHED.</u>

BENDIX, Acting P. J.

We concur:

WEINGART, J.

M. KIM, J.